1  Ronald O. Kaye Esq. (Bar Number 145051)
   KAYE, McLANE & BEDNARSKI
2  128 N. Fair Oaks Avenue
   Pasadena CA 91103
3  Telephone: (626) 844-7660
   Facsimile: (626) 844-7670
4  E-mail: rok_kmb@earthlink.net

5  R. Samuel Paz (Bar Number 62373)
   LAW OFFICES OF R. SAMUEL PAZ
6  Buckingham Heights
   5701 West Slauson Ave., Suite 202
7  Culver City, CA 90230
   Telephone:  (310) 410-2981
8  Facsimile:   (310) 410-2957
   samuelpaz@msn.com
9
   Co-counsel for Plaintiff Nina Morris
10

11                UNITED STATES DISTRICT COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13
   NINA MORRIS,                     )  CASE NO. CV 07-05954-JSW(CWx)
14                                   )
                    Plaintiff,       )  [District Judge John F. Walter]
15                                   )
                                     )  **NOTICE OF MOTION AND MOTION**
16  v.                               )  **TO STRIKE THE DEFENDANTS'**
                                     )  **ANSWER OR OTHER**
17  CALIFORNIA DEPARTMENT OF         )  **APPROPRIATE SANCTIONS FOR**
    CORRECTIONS, et al.,             )  **THE DESTRUCTION OF CRITICAL**
18                                   )  **EVIDENCE; MEMORANDUM OF**
                    Defendants.      )  **POINTS AND AUTHORITIES;**
19                                   )  **DECLARATION OF R. SAMUEL PAZ.**
                                     )
20  _____ )
                                        Hearing Date:    August 4, 2008
21                                      Hearing time:    1:30 p.m.
                                        Courtroom:       16
22                                      Pre-Trial Conf.: October 31, 2008
                                        Trial:           November 18, 2008
23

24  **TO THE STATE OF CALIFORNIA, ALL PARTIES AND THEIR**

25  **ATTORNEYS OF RECORD**:

26       PLEASE TAKE NOTICE that on August 4, 2008, at 1:30 p.m., before the

27  Honorable John F. Walter, Judge of the Central District of California, in Courtroom

28  16, United States District Court, 312 N. Spring Street, Los Angeles, California 90012,

Plaintiffs will move the Court for an Order striking the Answers of the responsible Defendants, or other appropriate sanctions.

The grounds for this motion is that the Defendant State of California's command staff at the California Youth Authority's Ventura County facility including the Superintendent, Assistant Superintendent, Chief of Security and the Watch Commander who investigated the Plaintiff's complaints of excessive use of force by Defendant KASHA CLEMONS ("CLEMONS") destroyed and/or failed to preserve a videotape taken at the scene of the use of force incident that was later used in the administrative investigation to absolve Defendant CLEMONS of administrative discipline, and is now the basis for the Watch Commander's, Assistant Superintendent's and Superintendent's hearsay testimony of how the incident occurred.

Further grounds for this motion are that California and federal law impose a duty to preserve critical evidence before litigation begins or before a discovery request. This duty requires a litigant to preserve what evidence it knows, or reasonably should know, will be critical in a pending action or one in the offing. Additionally, the watch commander and all command staff, including the Chief of Security, Assistant Superintendent and Superintendent are required by California Department of Corrections policy and procedure to ensure the videotape evidence is booked into evidence and to preserve all videotapes of use of force incidents for five years for the protection of the Department of Corrections from liability and for the protection of juvenile wards in their custody.

## LOCAL RULE 7-3 COMPLIANCE

On April 24, 2008, the plaintiff's counsel set forth in a letter the request to meet and confer in compliance with Local Rule 7-3 on the filing of Plaintiff's Motion for Dismissal or other appropriate sanctions for destruction of evidence. It set forth the facts and authority relied upon. On April 28 through April 30, 2008, the parties

discussed the matters on a number of occasions and were unable to resolve the issues without the assistance of the court.

This motion is based on this notice, the attached memorandum of points and authorities, the pleadings and papers on file in this action, and such other oral and documentary evidence as may be allowed at the hearing of this motion.

Dated: July 14, 2008          LAW OFFICES OF R. SAMUEL PAZ

By _____ S/S _____
R. Samuel Paz Esq.,
Attorney for Plaintiff Nina Morris

Dated: July 14, 2008          KAYE, McLANE & BEDNARSKI

By_____ S/S _____
Ronald O. Kaye, Esq.
Attorney for Plaintiff Nina Morris

1

# **TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES CITED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

3   POINTS AND AUTHORITIES IN SUPPORT  . . . . . . . . . . . . . . . . . . . . . . . . . 1

4     1.    INTRODUCTION AND BACKGROUND FACTS  . . . . . . . . . . . . . 1

5        A.    Introduction and Relief Sought  . . . . . . . . . . . . . . . . . . . . . . . . 1

6        B.    The Excessive Force Incident  . . . . . . . . . . . . . . . . . . . . . . . . . 2

7        C.    The Incident Videotape Was Recorded and Initially
              Preserved as Evidence in the Course of an Investigation  . . . . 3

8

9        D.    Lt. Harper's Depiction of the Incident Videotape in
              Her Report is Suspect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

10        E.    Although Obligated to View the Incident Videotape to
              Resolve the Conflicting Versions, No Supervisor Does So . . . .6

11

12            1.    The Chief of Security Abandoned his Duty to Review
                   and Preserve the Critical Evidence  . . . . . . . . . . . . . . . . 6

13            2.    The Superintendent Abandoned His Duty to Review
                   and Preserve the Critical Evidence. . . . . . . . . . . . . . . . . 8

14

15            3.    The Assistant Superintendent Abandoned his Duty
                   to Review and Preserve the Critical Evidence . . . . . . . . 9

16            4.    Every Supervisor Linked to the Review of the
                   Incident Violated CDCR Policy Requiring That They

17                    Review and Preserve the Critical Evidence . . . . . . . . . 10

18        F.    The Defendants Violated the Mandatory CDCR Policy to
              Preserve and Maintain Videotapes of Use of Force Incidents

19              for Five Years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

20

21     2.    THE DESTRUCTION/FAILURE TO PRESERVE THE
          CRITICAL EVIDENCE RECORDED DURING THE
          ACTUAL INCIDENT REQUIRES STRIKING

22          DEFENDANTS' ANSWERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

23        A.    The Defendants Were under a Federal Duty to Preserve
              the Incident Video  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

24

25        B.    Destruction of the Incident Video Satisfies the Factors for
              Striking the Answer and Entering a Default  . . . . . . . . . . . . 12

26            1.    Willfulness, Fault or Bad Faith  . . . . . . . . . . . . . . . . . . 13

27

28

## TABLE OF CONTENTS CONT.

2. The Public's Interest in Expeditious Resolution of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3. Prejudice to the Plaintiff . . . . . . . . . . . . . . . . . . . . . . 15

4. Policy Favoring Disposition on the Merits . . . . . . . . 16

5. Availability of less Drastic Sanctions . . . . . . . . . . . . 16

C. Exclusion of Evidence, Appropriate Jury Instructions and an Award of Costs Are Appropriate Sanctions When Spoliation Deprives a Party of an Opportunity to Inspect the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anheuser-Busch, Inc. v. Natural Beverage Distributors,*

    69 F.3d 337 (9th Cir. 1995) ........................................................ 11

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................ 13

*Burge v. St. Tammany Parish*, 187 F.3d 452 (5th Cir. 1999) .................... 13

*Computer Associate International, Inc. v. American Fundware, Inc.*,

    133 F.R.D. 166 (DC Co.1990) ................................................ 12

*Donato v. Fitzgibbons*, 172 F.R.D. 75 (D.C.N.Y. 1997) ........................... 18

*Halaco Engineering Co. v. Costle*, 843 F.2d 376 (9th Cir. 1988) ............. 18

*Kounelis v. Sherrer*, 529 F. Supp. 2d 503 (D.C. N.J. 2008) ...................... 12

*Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006) .................. 11, 12

*MOSAID Techs. Inc. v. Samsung Electrics Co.*,

    348 F. Supp. 2d 332 (D.N.J. 2004) ........................................ 12

*Malone v. U.S. Postal Service*, 833 F.2d 128 (9th Cir. 1987) ................... 16

*McCann v. Mangialardi*, 319 F.3d 301 (7th Cir. 2003) ........................... 13

*Newsome v. McCabe*, 337 F.3d 782 (7th Cir. 2003) ................................ 13

*Unigard Security Insurance Co. v. Lakewood Engineering &*

    *Manufacturing Corp.*, 982 F.2d 363 (9th Cir. 1992) ........................... 17

*United States ex rel. Wiltec Guam, Inc. v. Kahaluu Construction Co.*,

    857 F.2d 600 (9th Cir. 1988) ................................................ 12

*Wm. T. Thompson  Co. v General Nutrition Corp.*, 593 F. Supp. 1443 (CD

    Cal.1984) ................................................................................ 11

# TABLE OF AUTHORITIES CONT.

## FEDERAL STATUTES

42 U.S.C. § 1983 ............................................................................ 2

## STATE STATUTES

Cal. Penal C. § 135 ..................................................................... 14

Cal. Penal Code § 242. ................................................................ 13

Cal. Govt C. § 910 ...................................................................... 14

**POINTS AND AUTHORITIES IN SUPPORT**

**1. INTRODUCTION AND BACKGROUND FACTS.**

    **A. Introduction and Relief Sought.**

Plaintiff brings this motion to seek appropriate sanctions for the apparent intentional destruction or wilful failure to preserve a videotape of the actual incident of the use of force, the most central and fundamental evidence of the case, akin to the blood sample of the defendant in a criminal prosecution for the charge of driving under the influence. As a result of a series of violations of mandatory policy and procedures of the California Department of Corrections and Rehabilitation ("CDCR"), Plaintiff NINA MORRIS has been deprived of access to the quintessential, indisputable evidence corroborating her excessive force claim. With this evidence, the jury would have had the vantage point to accurately assess what actually occurred. Now that the evidence is gone, all the jury has is the dispute between the recollection of interested parties; a dispute where inherently MORRIS is at a disadvantage before the jury challenging the testimony of a number of law enforcement officials in a position of authority.

Plaintiff seeks the imposition of sanctions of: (1) striking the answers of the State of California, CDCR and Superintendent NUÑEZ; or, in the alternative, (2) excluding any testimony or reference by any State witnesses, including experts, to any written or oral hearsay statement that purports to interpret or describe the incident depicted in the destroyed videotape of the incident ("incident video") during the remaining pre-trial motions or trial of this action; (3) imposing a curative instruction such that the jury will be instructed that the Defendants had an affirmative duty under the law to preserve the incident video, but they failed to do so, or it was destroyed, and if the video were viewed, it would depict the events which corroborate the Plaintiff's testimony of how the incident occurred; (4) precluding the Defendants to offer any evidence about the reasons for, or the circumstances surrounding, the destruction or failure to preserve the evidence; and, (5) an order awarding Plaintiff

1

1   costs for all the time expended in seeking to resolve the issue of the destroyed

2   evidence.

3       Plaintiff NINA MORRIS, who is presently age 21 years, is a resident of

4   Riverside County, and brings this action for violations of civil rights under 42 U.S.C.

5   § 1983 alleging claims of excessive force against CLEMONS, a youth correctional

6   counselor ("YCC"), and supervisory liability against then Superintendent of the

7   Ventura Youth Correctional Facility ("VYCF"), RUBEN NUÑEZ.  Plaintiff also

8   alleges state claims of battery and negligence against the STATE OF CALIFORNIA

9   and CLEMONS.  MORRIS was a California Youth Authority ("CYA") ward housed

10  in Ventura Youth Correctional Facility ("VYCF") on October 30, 2006 at the time of

11  the incident which gives rise to these claims.  Shortly thereafter, she was released

12  from custody.

13      **B.     The Excessive Force Incident.**[1]

14      On October 30, 2006, between 6:30 and 7:00 a.m., NINA MORRIS, had gone

15  to breakfast and was returning to her room located in Miramar Housing Unit with the

16  rest of the female wards in her housing unit.  She and another girl stopped in the

17  hallway near her room and were looking at the day's assignments for academic

18  classes posted on the wall.  As they started to leave to go to their rooms,  another

19  ward, Vanessa Huerta, without warning, ran from the doorway of her room towards

20  MORRIS and attacked her by swinging her fists.  MORRIS was hit in the face a few

21  times and defended herself by pushing Huerta away, causing Huerta to fall on her

22  buttocks.  The blows did not hurt MORRIS.

23

24  _____

25  [1]  The facts of how the altercation between the wards developed, that

26       Defendant CLEMONS came running to intervene, used pepper spray, used

27       force, and the seriousness of the fracture suffered by Morris in the incident

28       are not in dispute.  Defendants do dispute that the force was unnecessary or

         excessive.

2

MORRIS then restrained Huerta by standing and leaning down and forward over Huerta with both of her hands holding ward Huerta's arms down near Huerta's upper arms and shoulders, so as to not be hit in the face, while Huerta, with her back on the floor, continued to swing her arms at MORRIS's chest and face, but did not hit her.  Within seconds, CLEMONS, ran up to MORRIS and Huerta and began to spray O.C. (pepper spray) at them.  Before he determined whether the girls would separate after the application of the pepper spray, CLEMONS struck MORRIS violently and caused multiple fractures of Plaintiff's right clavicle, and in doing so, used excessive force against MORRIS.  CLEMONS is a former high school and college athlete who is very muscular, weighing 235 lbs., and standing 5'8".

Thereafter, MORRIS was taken to the VYCF Medical Clinic for a severely fractured clavicle, and later underwent surgical repair with internal fixation devices, a metal plate and screws.  She sustained permanent injuries, scaring and disfigurement.

## C.    The Incident Videotape Was Recorded and Initially Preserved as Evidence in the Course of an Investigation.

The incident where CLEMONS violently struck the shoulder of MORRIS causing a severe fracture of the clavicle was videotaped by one of the many stationary cameras installed in the housing areas for female wards.  These stationary cameras were placed in the facility precisely for the purpose of capturing incidents of altercations and problems between wards, and wards and staff.  The cameras are (*inter alia*) to "[A]ide in the investigation of alleged inappropriate activities of staff." (*See* Exhibit 1, "Living Unit Digital Video Surveillance Policy, General Policy, Purposes, AGO 484-485.)  The attached photograph depicts that the camera in the housing unit is directly above where the incident occurred.  (*See* Exhibit 2, photo of "Hall A" in the Miramar Housing Unit, and declaration of R. Samuel Paz, attached hereto.)

1   It is without dispute that the actual incident of CLEMONS using force on

2   MORRIS was captured by the security camera and recorded in a video recording[2] and

3   that the incident video recording was reviewed by Lt. Harper, the duty Watch

4   Commander.  It is also without dispute that Lt. Harper's written interpretation of the

5   incident video (*see* Exhibit 3, Report of Harper, stamped AGO 138, 139, 140 & 141)

6   was relied upon by the Chief of Security, the Assistant Superintendent, the

7   Superintendent and the Institutional Force Review Committee ("IFRC") in their

8   review of incident.  Although required to do so by CDCR policy and procedures

9   (discussed below), according to the deposition testimony of each of these witnesses,

10  **no one**, other than Lt. Harper, saw the incident video prior to its destruction or loss.

11  On November 3, 2006, four days after the incident, Lt. Harper conducted an

12  interview with MORRIS.  That interview was videotaped by a hand-held camera.  In

13  the written report, Lt. Harper affirmatively stated "Yes" in response to the question

14  whether the "videotape**s** [plural] were processed as evidence." (*See* Exhibit 3, AGO

15  139, emphasis added.)  Thus, both videotapes, the incident video recorded in the

16  housing unit on October 30, 2006 and the interview video, recorded on November 3,

17  2006, were booked into evidence and made available to be viewed by the Chief of

18  Security, the Assistant Superintendent and the Superintendent.

19  \\

20  \\

21

---

22  [2]  As used in this motion, the "videotape" that the documents produced in
23      discovery by the defense refer to is actually an electronic CD-ROM or DVD
24      disk recording that is prepared from a computer hard drive video monitoring
25      system that records from the fixed camera stations in the facility.  These
26      recordings are preserved for 30 days and routinely downloaded to a DVD
27      disk in the event of a "significant incident" such as a use of force as
        required by CYA policy.  *See* Exhibit 1, "Procedures" and Exhibit 7, DT
        Dwayne Johnson p. 18:15 - 19:3.

28

**D.     Lt. Harper's Depiction of the Incident Videotape in Her Report is Suspect.**

In the videotaped interview on November 3, 2006, MORRIS directly states that her clavicle was fractured at the moment when CLEMONS "slammed" her shoulder as she stood in the hallway, then she fell.[3]  Lt. Harper documented that statement in her report that MORRIS told her that the fracture to the bone occurred when "Clemons grabbed her shoulder." (*See* Exhibit 3,  AGO 139.)  Under the CYA's Policy on Use of Force, this was a significant injury due to an application of use of force and constituted a complaint by MORRIS of excessive force.[4]  Yet Lt. Harper, relying solely on her interpretation of the now destroyed videotape of the incident, in her "Report of Findings" as required by the CYA, stated:

> Video of incident shows that YCC Clemons did not fall on top of the ward but did appear to grab her shirt as he separated combatants.  Ward appears to fall on her right shoulder as she is pulled away. YCC Clemons (sic) written report is consistent with the video. (*See* Exhibit 3 pgs. 139, 140 & 141.)

In her evaluation, Lt. Harper relies solely[5] on the "video of the incident" and concludes that there was no excessive force, essentially ignoring MORRIS' accusation that the force used by CLEMONS directly to her shoulder broke her bone. Therefore, Lt. Harper concluded that MORRIS' injury stemmed from her fall.

---

[3]  November 3, 2006, Video Interview of MORRIS available in DVD Format for the Court's review.

[4]  *See* Exhibit 3, pg. AGO 138, Ward Interview Format re-use of force, "I., 1-3."

[5]  In her deposition, when confronted with the proposition that she espouses in her report "that MORRIS appears to fall on her right shoulder" and that is how she was hurt, Lt. Harper admitted that she never spoke to CLEMONS during her review, and never asked him if MORRIS was injured by his hitting her, or by a fall. (*See* Exhibit 4, Deposition Transcript ("DT") Harper p. 32:19-24)

Harper then retreated from the conclusion that MORRIS fractured her bone from a fall and stated:

> In the report to the Chief, it doesn't make the conclusion that she injured her shoulder when she fell to the floor.  It only shows that – I only shows that – I only said that, "the ward appears to fall on her right shoulder when she was pulled away."  (*See* Exhibit 4, DT Harper pp. 32:25-33:1-6.)

Later in the deposition, Lt. Harper totally withdrew her opinion that the injury was caused by a fall calling it "irrelevant" and then further retreated stating that how MORRIS was injured "wouldn't have been my focus in this particular incident." (See Exhibit 4, pp. 33:33:7-10 and 34:20-35:1-23.)

Thus, when challenged about the accuracy of her conclusions from her review of the now unavailable videotape, Lt. Harper appears unsure of what she saw.  Lt. Harper's failure to stand by her conclusion about the cause of MORRIS's injury reveals the likelihood that the video in fact did not depict what Lt. Harper suggests: MORRIS did not fall on her right shoulder.

Moreover, the accuracy of Lt. Harper's depiction of the videotape is further undermined by the deposition statement of CLEMONS (and the testimony of the Plaintiff) that after CLEMONS struck MORRIS she fell on **her left shoulder** and not her right shoulder as asserted by Lt. Harper.  (*See* Exhibit 5, DT Clemons p. 47:16-20, 48:2-4 and 48:13-23.)

Unfortunately, or perhaps conveniently for the Defendants, the videotape is destroyed, and the unequivocal evidence of what occurred is unavailable.

**E.     Although Obligated to View the Incident Videotape to Resolve the Conflicting Versions, No Supervisor Does So.**

**1.     The Chief of Security Abandoned his Duty to Review and Preserve the Critical Evidence .**

The Policy on the Supervisory Review of Use of Force instructs the Watch Commander that "All videotapes related to the incident . . . are forwarded to the Chief

1    of Security **for review**." (*See* Exhibit 6, "V. Evaluating the Use of Force; A.

2    Supervisory Evaluation AGO 261-262, emphasis added.)   The Chief of Security,

3    Dwayne Johnson, was required to review the Watch Commander's reports to "ensure

4    the quality of the report for accuracy and **credibility**." (*See* Id., AGO 262-263,

5    emphasis added.)  However, it was his testimony, that although he approved Lt.

6    Harper's conclusions and "concurred with the watch commander's recommendations"

7    he admitted **he never saw the videotape** Lt. Harper relied upon, and had no basis to

8    know if she was truthful or accurate. (*See* Exhibit 7, DT Johnson, p. 21:10-25-22:1-

9    25.)  Johnson admitted "I've never seen the video" of the incident, although required

10   to do so by policy and procedure.  (*See* Exhibit 7, p. 25:23-26:1-17.)  When asked

11   who started the altercation, Johnson stated that he did not know without seeing the

12   videotape.  And he admitted that neither could he determine whether the force used

13   by CLEMONS was excessive and violated policy and MORRIS' rights.  "Without

14   viewing the video, I can't tell you if it was excessive or not." (*See* Exhibit 7, p. 30:5-

15   24.)

16        The Chief of Security further testified it was the responsibility of the Watch

17   Commander to preserve the videotape as evidence. (*See* Exhibit 7, p. 18:15-25-19:1-3

18   and 23:1-7.)  Furthermore, the Chief of Security testified that there was no

19   documentation in the entire record of this incident or in the supervisor's review, that

20   presented any explanation or reason why the videotape was not preserved.  (*See*

21   Exhibit 7, p. 23:8-20.)  This testimony is very important in light of the Chief of

22   Security's responsibilities for the equipment that recorded the use of force incident.

23        The Chief of Security is required to ensure that (1) "the digital video

24   surveillance equipment is maintained and in proper working order on a daily basis"

25   and (2) to ensure that videos (CD-ROMS) "that have been downloaded (recorded)

26   after an incident will be stored in accordance with the rules of evidence." (Exhibit 1,

27   pg. AGO 485.)   The Chief of Security's daily duty to ensure the digital video

28   surveillance equipment "is maintained and in proper working order" is parallel to the

7

First Watch Lieutenant's responsible to ensure that "each living unit digital video surveillance equipment is maintained and in proper working order on a daily basis." (Exhibit 1, AGO 485.)  Furthermore, the Watch Lieutenant is responsible to "report any problems with the digital video surveillance equipment to the Chief of Security no later than the next watch via e-mail"; "submit appropriate work orders to correct the problem"; and "denote steps taken in the duty lieutenant logbook and the video surveillance logbook." (Id., AGO 485.)   The Chief of Security testified that there is no evidence or documentation that the equipment failed or that there was any difficulty in downloading the incident videotape or that it was not recorded.  (*See* Exhibit 7, p. 23:8-20.

### 2.    The Superintendent Abandoned His Duty to Review and Preserve the Critical Evidence.

Defendant Superintendent NUÑEZ testified that he began working in 1998 at VYFC the Chief of Security, was advanced to Assistant Superintendent in 2001 and became the Superintendent (the highest ranking command supervisory position) of VYFC during 2003 and 2004.  (*See* Exhibit 8, DT Nuñez, p. 8:1-19.) He was the Superintendent present at VYCF on October 30, 2006, at the time MORRIS was injured, (*See* Exhibit 8, pp. 13:1-9 & 26:11-15) and went to interview MORRIS in the VYCF hospital-clinic immediately after her shoulder was broken.  (*See* Exhibit 8, pp 13:23-14:1-7.)

NUÑEZ explained that when a use of force incident is videotaped and the Watch Commander reports affirmatively that the "Videotapes processed as evidence," that it begins a review of the incident which culminates with the review of the "Institutional Force Review Committee," ("IFRC") "and **it's the superintendents's responsibility to review all of the use of force videos.**"  (*See* Exhibit 8, p. 20;11-21, emphasis added.)

The process whereby the superintendent would obtain the video is a relatively simple one.  If the superintendent was notified of an incident, especially a critical one,

8

such as MORRIS' injury requiring off-facility emergency hospitalization and surgery, the Local Area Network Manager would be notified and a disk copy of the incident would be made and "turned over to the superintendent."  Consequently, the superintendent would have the opportunity to review it on a computer monitor. (*See* Exhibit 8, 22:7-24 & 25:11-21.)  Yet, NUÑEZ was not even aware that the destroyed videotape had been made (*id.*, pp. 19:23-25) and had no memory of ever reviewing the videotape of the incident. (*See* Exhibit 8, 28:5-8 & 29:8-13.)

### 3. The Assistant Superintendent Abandoned his Duty to Review and Preserve the Critical Evidence.

David Finley, the "acting" Superintendent at the time of the incident while Superintendent NUÑEZ was still on the job (Exhibit 9, DT David Finley pg. 5:4-6:3) and he reviewed and approved  Lt. Harpers report (Exhibit 3) on three separate occasions.  As part of the review, he was the ranking person at the IFRC, along with Dwayne Johnson, the Chief of Security and five other senior staff persons meeting on November 15, 2006 to review the incident, only two weeks after CLEMONS' use of force on MORRIS.  Their conclusion echoed Lt. Harper's unsupported speculation that MORRIS "landed on her right shoulder," totally ignoring MORRIS' video and audio tape recorded assertion that she was injured when CLEMONS "slammed" her. (Exhibit 10, "IFRC Review and Analysis AGO 527.)  Notwithstanding the obvious conflict between the statements of MORRIS and Lt. Harper, the IFRC abandoned their collective duty to review the incident video.  (Exhibit 9, DT David Finley pg. 41:16 - 42:3.)  Finley was fully aware at the time he signed and approved the IFRC's Review and Analysis on November 15, 2006, that if the incident video was "lost, destroyed or not properly booked into evidence," that there was "plenty of time to go and request another copy be made."  (*Id.*, pg. 42:16-24.)  Finley never requested another copy of the incident video.

On November 5, 2006, he reviewed the packet of materials collected during the investigation entitled the "Use of Force Incident Review," whose purpose "is used to

review the entire incident and which he signed and approved." (Exhibit 9, DT David Finley pg. 18:3-26.)  From his review, Finley knew that MORRIS had stated that when CLEMONS hit her shoulder, that is when it broke.  (*Id.*, pg. 33:12-34:5.)  Yet, he never asked CLEMONS where he hit MORRIS. (*Id.*, pg. 33:2-11).

Finley abandoned his duty to review the incident video that Lt. Harper recorded and preserved as evidence although he reviewed and approved the Use of Force Incident Review on November 5, 7, and again on November 15, 2006.  (Exhibit 9, DT David Finley pgs. 34:6 - 35:2; 35:9 - 37:1 & 37:2-24.)

> ### 4.    Every Supervisor Linked to the Review of the Incident Violated CDCR Policy Requiring That They Review and Preserve the Critical Evidence .

Each of these Supervisors were obligated to follow the CDCR policy on the Monitoring of Use of Force which requires that:

> On at least a monthly basis the Institutional Force Review Committee shall meet to review all completed use of force incidents after critique of area managers.  The IFRC shall examine all levels of responsibility exercised by subordinate managers and supervisors **and ensure the appropriateness of completed documentation**.  The IFRC shall make a determination concerning the appropriateness of the use of force based upon the information and reports available.
>
> **All superintendent/assistant superintendent shall personally view all videotapes arising from use of force incidents**. (*See* Exhibit 11, "VI. Monitoring of Use of Force, AGO 264, emphasis added.)

Thus, every supervisor is mandated by CDCR policy and procedure to view the use of force incident videotape.  By failing to do so, they  violated the policy and procedure created to insure the integrity of the investigation, and essentially ignored **the most critical evidence of what actually occurred.**  The Defendants cannot now

1    defend themselves based upon Lt. Harper's *post hoc* interpretations of what was on

2    the incident videotape which no one can corroborate.

3            **F.**      **The Defendants Violated the Mandatory CDCR Policy to Preserve**

4                    **and Maintain Videotapes of Use of Force Incidents for Five Years.**

5           The policy on Use of Force mandates that the Chief of Security at each CYA

6    facility is *required* to maintain a database containing use of force.  The policy

7    requires that "*All videotapes that record the use of force by staff shall be maintained*

8    *for a period of five years.*"  (*See* Exhibit 11, AGO 265, emphasis in the original.)

9           Moreover, when a ward accuses a staff member of excessive use of force as in

10   this case, the necessity for the preservation of the evidence is twofold: (1) to protect

11   the staff and YA from unsupported accusations, (2) to protect the ward from

12   excessive force or criminal conduct by staff.  Thus, the destruction or loss of the

13   incident videotape by the Defendants responsible under the law and by their policies

14   and procedures to preserve this critical evidence leaves the Plaintiff with the inability

15   to prove that she is truthful and to impeach the Defendants.

16   **2.**      **THE DESTRUCTION/FAILURE TO PRESERVE THE CRITICAL**

17            **EVIDENCE RECORDED DURING THE ACTUAL INCIDENT**

18            **REQUIRES STRIKING DEFENDANTS' ANSWERS.**

19           **A.**      **The Defendants Were under a Federal Duty to Preserve the Incident**

20                 **Video.**

21          Federal law imposes a duty to preserve critical evidence before litigation begins

22   or before a discovery request.  This duty requires a litigant to preserve what it knows,

23   or reasonably should know, will be critical evidence in a pending action or one in the

24   offing. *See Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348

25   (9th Cir. 1995) (dismissal proper where conduct sanctioned is based on willfulness,

26   fault, or bad faith.); *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006)

27   (destruction of computer files by the plaintiff alleging, *inter alia*, violations of the

28   anti-retaliation provision of the False Claims Act, in accord); and *Wm. T. Thompson*

*Co. v  General Nutrition Corp.*, 593 F. Supp. 1443, 1156 (CD Cal.1984)(approving striking answer and entering default as a sanction for destruction of books and computer files central to an anti-trust action).

Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *MOSAID Techs. Inc. v. Samsung Elecs*. Co., 348 F. Supp. 2d 332, 335 (D.N.J. 2004). Spoliation occurs when a party has intentionally or negligently breached its duty to preserve potentially discoverable evidence. *Id*., cited with approval in *Kounelis v. Sherrer*, 529 F. Supp. 2d 503 (D.C. N.J. 2008).   *See also Computer Assoc. Int'l, Inc. v. American Fundware, Inc.*, 133 FRD 166, 170 (DC Co.1990) (defendant's wilful destruction of source code for defendant's program supported a default sanction).

The duty to preserve evidence is implied from public policy: "Destruction of evidence cannot be countenanced in a judicial system whose goal is to find the truth through honest and orderly production of evidence under established discovery rules." *Id*.

**B.     Destruction of the Incident Video Satisfies the Factors for Striking the Answer and Entering a Default.**

For dismissal to be proper, the conduct to be sanctioned must be due to willfulness, fault, or bad faith. *Anheuser-Busch*, *supra* at 348.  Before imposing the "harsh sanction" of dismissal, the district court should consider the following factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.  *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). While a district court need not make explicit findings regarding each of these factors, *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 603

(9th Cir. 1988), a finding of "willfulness, fault, or bad faith" is required for dismissal to be proper. *Anheuser-Busch*, at 348.

### 1.   Willfulness, Fault or Bad Faith.

A party's destruction of evidence qualifies as **wilful** spoliation if the party has some notice that the evidence was potentially relevant to the litigation before it was destroyed. *Leon*, at 959. As one of the largest juvenile justice systems in the world, Defendants are sophisticated litigants aware of their obligation to preserve relevant evidence. Every officer and employee is keenly aware of the duty to preserve evidence taken at the scene of an alleged crime, as here, Battery (Cal. Penal C. § 242). *See generally,* Cal. Commission of Peace Officer Standards and Training, Learning Domain 30 "Primary Investigation, Version 3, Chapter 2, "Evidence Collection." pub. 1997, revised 2006.

Further, it is common knowledge in law enforcement that in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the U.S. Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Police officers nationwide know that they can held liable for *Brady* violations.[6]

---

[6]   *See e.g.*, *Burge v. St. Tammany Parish*, 187 F.3d 452, 479-480 (5th Cir. 1999) (affirming district court's denied deputy's motion for summary judgment on qualified immunity grounds, plaintiff later obtained a jury verdict for $ 4,075,000 in damages against deputy at trial and did not appeal. *Burge v. St. Tammany Parish Sheriff's Office*, 2001 WL 845463, at 1 (E.D. La. 2001). See also *McCann v. Mangialardi*, 319 F.3d 301, 303 (7th Cir. 2003) (suppression of exculpatory evidence by police officers requires recognizing a cause of action against the officers*). Newsome v. McCabe*, 337 F.3d 782, 787 (7th Cir. 2003) (jury award of $15 million in damages for suppression of evidence).

Defendant NUÑEZ and the rest of the command staff were fully aware that the incident video of MORRIS and CLEMONS, and the eye witnesses present at the time CLEMONS used force on MORRIS, would be the central focus of an administrative, and possibly, a criminal investigation and prosecution.  It became even more central to any inquiry when MORRIS was found, by the doctors at St. Johns, an outside medical facility, to have suffered a serious, life altering injury requiring surgery.  It became even more evident when MORRIS was, only with the permission of the Defendants, visited by counsel R. Samuel Paz at VYCF, and shortly thereafter, a Claim for Damages was filed by MORRIS with the Defendants in compliance with Cal. Govt C. § 910.  Despite being aware of the need to preserve the at-scene evidence of the incident, and that the Plaintiff would proceed with litigation, Defendants failed to preserve or destroyed the incident video.[7]

Further, the inconsistent testimony of Lt. Harper about what the video depicted and how MORRIS injured herself – testimony which is contradicted by CLEMONS and MORRIS who both state MORRIS fell on her left shoulder, should raise serious concern for the Court.  The failure to preserve **the critical evidence** of the incident – the videotape, which appears to have been misrepresented by **the only witness** who purportedly reviewed it, reveals the wilfulness, the bad faith, or at minimum, the gross negligence of the Defendants.

**2.      The Public's Interest in Expeditious Resolution of Litigation.**

The first and second factors support striking the answer, appropriate sanctions and denying summary judgment when the destruction of evidence "obscur[es] the factual predicate of the case and consum[es] months of sanction-related litigation."  *Leon*, at 958 n.5.  Defendants' spoliation of the at-scene evidence obscures and

_____

[7] It is noteworthy that it is a crime, under California law, to wilfully "destroy or conceal" anything that is to be produced as "evidence upon any trial, inquiry **or investigation** whatsoever authorized by law." Cal. Penal C. § 135 (emphasis added).

14

affects the very heart of the matter in dispute: whether CLEMONS used excessive force.  Defendants deny this, but destruction of the first hand account of what occurred deprived Plaintiff of this critical and much more reliable evidence. Destruction of the at-scene evidence has obscured the factual predicate of the case, and Plaintiff's counsel has spent significant resources investigating and resolving the spoliation issues. The first two factors therefore support dismissal.

### 3.     Prejudice to the Plaintiff.

A party suffers prejudice if the opposing party's actions impair the party's ability to go to trial or threatens to interfere with the rightful decision of the case. *Anheuser-Busch*, at 353-54 (citations omitted).  Whether CLEMONS used excessive force would have been determined by the incident video, primary evidence of what actually occurred.  Plaintiff and their experts have been deprived of the ability to determine whether the critical evidence would have supported their theory of the case.  Prejudice was found in *Anheuser-Busch* when the suppression of documents "forced Anheuser to rely on incomplete and spotty evidence." Id.

In this case, the destruction of the at-scene evidence forces Plaintiffs to rely on secondary evidence preserved by Defendant, post-incident self-serving reports and depositions of admittedly biased witnesses.  Video evidence which Plaintiff is confident would have supported her theories of liability and causation were destroyed, and the remaining secondary evidence is wholly incompetent.  Although Plaintiff's experts may be able to present reports and testify based on the evidence preserved from the Defendants' incident and medical reports, there is no doubt that the spoliation in this case forces Plaintiff to "rely on incomplete and spotty evidence." *Anheuser-Busch*, at 353-354.

 Not only is the evidence incomplete, but it is inherently biased because it is limited to that which the Defendants chose to preserve.  The spoliation therefore threatens to interfere with the rightful decision of the case by preventing full

development of the Plaintiff's theories of liability and causation, and ultimately deprives the Plaintiff of a fair trial.

### 4.    Policy Favoring Disposition on the Merits.

The fourth factor, the public policy favoring disposition of cases on their merits, weighs against dismissal. Standing alone, that factor is not sufficient to outweigh the other factors. *Leon*, at 960-61, quoting *Malone v. U.S. Postal Service*, 833 F.2d 128, 133 n.2 (9th Cir. 1987).  Nor should this Court be inclined to give great weight to this factor when the unilateral wilful conduct of one party's spoliation hinders the parties' ability to investigate and present the merits of this case, and deprives the court of the ability to give the Plaintiffs a fair trial.

### 5.    Availability of less Drastic Sanctions.

Finally, a court must consider the availability of less drastic sanctions.  Short of striking the answer and entering default judgment, Plaintiff urges exclusion of Defendant officers' testimony who rely on the interpretation of the destroyed incident video and any of Defendants' witnesses and experts who rely on this destroyed evidence. Plaintiff also requests, in conjunction with the exclusion of the testimony, that the Court order that an adverse jury instruction advising the jury that the Defendants were under a legal duty to preserve the critical evidence, that they destroyed the critical evidence and that they must presume that the destroyed video supported the Plaintiff's testimony of how the incident occurred.

However, although these lesser sanctions are feasible, they do not cure the prejudice caused to the Plaintiff and to this litigation. Specifically, these lesser sanctions do not address the fact that the wilful conduct of the Defendants has limited the evidence available to the Plaintiff to oppose a motion for summary judgment or to present at trial.  The wilful, if not bad faith, conduct of the Defendants most likely hid the "smoking gun."  If it was helpful to the Defendants, common sense tells anyone that it would be front and center: "Exhibit A" for the defense.

Ultimately, exclusion of evidence is an appropriate sanction when spoliation deprives a party of an opportunity to inspect the evidence. (*See Unigard Security Ins. Co. v. Lakewood Engineering & Manufacturing Corp.*, 982 F.2d 363, (9th Cir. 1992) discussed in the next section.) Defendants' destruction of the at-scene evidence in the incident video prevents Plaintiff from developing her theories of liability and damages. Excluding Defendants' unreliable evidence of what is on the incident video helps to level the evidentiary playing field, but that sanction does not account for the possibility that the video contained additional evidence to support Plaintiff's theories of liability and causation. An adverse jury instruction, combined with exclusion of evidence, helps to offset the risk that evidence proving liability was lost.

But imposing these two sanctions in tandem would still not cure the fact that Defendant is limited to evidence from the scene that Defendants chose to preserve. Striking the answer of the parties responsible for the destruction of the evidence, the State of California and Superintendent NUÑEZ, entering a default judgment and setting a hearing on damages is the only sanction that addresses this type of prejudice caused by parties who know that CDCR policy, state and federal law mandate the they preserve critical evidence of a serious incident.

**C.** **Exclusion of Evidence, Appropriate Jury Instructions and an Award of Costs Are Appropriate Sanctions When Spoliation Deprives a Party of an Opportunity to Inspect the Evidence.**

In *Unigard Security Ins. Co. v. Lakewood Engineering & Manufacturing Corp.*, 982 F.2d 363, (9th Cir. 1992), Unigard, the insurer of a large boat, brought subrogation claims against Lakewood Engineering, the manufacturer of an electric space heater that Unigard thought was responsible for the fire that destroyed the vessel. Unigard's claims were dismissed at summary judgment after the district court excluded Unigard's expert witness and other evidence from the boat and heater as a sanction for its having destroyed the heater and the remains of the boat before filing suit. (Id., 365.)

The Ninth Circuit upheld the sanction as part of a district court's inherent powers of the " broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial.  Within this discretion lies the power . . . to exclude testimony of witnesses whose use at trial . . . would unfairly prejudice an opposing party." Id., at 368, *citing Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980).  *Unigard* confirmed the power of the district court to sanction under its inherent powers not only for bad faith, but also for willfulness or fault by the offending party. [Id., at 368, fn 2, emphasis added, *citing Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988)].  In adopting the district court's findings that "Lakewood is precluded from gaining expert testimony related to whether the heater caused the fire," and that "plaintiff's destruction of key evidence renders a full defense impossible," *Unigard* held that "allowing Unigard to introduce the testimony of its experts would unfairly prejudice Lakewood and thus preclude the court's ability to conduct a fair trial." (*Id.*, at 368). Moreover, the court rejected Unigard's argument that an adverse instruction standing alone would have been sufficient stating:

> Unigard's destruction of evidence was not in dispute; it precluded
> Lakewood from any opportunity to inspect the evidence; and it rendered
> unreliable virtually all of the evidence that a finder of fact could
> potentially consider. Given these factors, it was within the district court's
> discretion to determine that a rebuttable presumption against Unigard
> would have been insufficient to cure the prejudice arising in the context
> of this case.

*Donato v. Fitzgibbons*, 172 F.R.D. 75 (D.C.N.Y. 1997) is also instructive.  In that case the defendants, a city police department and its police officers, were involved in a automobile collision, and critical evidence of liability, the headlights of the police vehicle which would reveal whether they were on or off at the time of the collision, was destroyed by the police officers responsible for preserving them.  Id.,

77. The court concluded "that bad faith is present in the failure to safeguard the evidence . . . ." Id., 80. The basis for this conclusion was stated as follows:

> The failure of defendant Orangetown to safeguard this evidence is even more egregious because the Orangetown Police Department is, or should be, in the business of insuring that evidence is handled properly. This is not a situation where an organization unaccustomed to the requirements of maintaining chain of custody and retaining important evidence has failed to preserve and protect items relevant to litigation. (Cite omitted.) Rather, the town of Orangetown, through its Police Department, is experienced, and has procedures in place, with regard to retaining and safeguarding evidence. There is no excuse for their failure in this instance. *Id.,* 80.

The court found that "[i]f the property had been connected with a criminal case being prosecuted by the County with the assistance of the Police Department, I am certain that it would not have been handled so cavalierly." *Id.* The court also found that the motive of the police department was rather obvious:

> [I]n this case, the Police Department had no incentive to safeguard the property because they, and one of their officers, were the ones being accused of wrongdoing. Thus, as evidenced by the history of bad faith in the discovery process, I conclude that the intent of those responsible for retaining the evidence was to obfuscate and impede the process at every step. Id.

The court in *Donato* adopted cases where an adverse inference charge "serves two purposes -- remediation and punishment." *Id.*, 81, cites omitted.) It explained that "[t]he remedial purpose of the sanction serves to place the prejudiced party in the same position with regard to its ability to prove its case as it would have been in if the evidence had not been destroyed." *Id.,* 82. It also found that the punitive purpose

both deters parties from destruction of relevant evidence and directly punishes the party responsible for spoliation stating:

> The law, in hatred of the spoiler, baffles the destroyer, and thwarts his iniquitous purpose, by indulging a presumption which supplies the lost proof, and thus defeats the wrongdoer by the very means he had so confidentially employed to perpetrate the wrong.  Id., *citations omitted*.

In the instant case the same policy reasons apply.  Similar to the police force in Orangetown, the supervisory staff at the CYA are " experienced, and [have] procedures in place, with regard to retaining and safeguarding evidence" particularly procedures for safeguarding videotapes of conduct within the institution – evidence which is critical to assessing criminal culpability or civil liability in a dispute.  And similar to the *Donato* case, with the control of this evidence being fundamental to their roles within the institution, this Court should attribute bad faith to the supervisory staff for the destruction of this critical evidence.

After making its analysis, the *Donato* court assessed that the police department's destruction of the evidence stemmed from "bad faith and gross negligence," and the appropriate sanctions ordered were:

(1) to "preclude defendant town of Orangetown from submitting any expert testimony whatsoever about the state of the headlights after the accident;

(2) to preclude a police detective "from testifying about his observations of the headlights and any conclusions he drew;"

(3) inform the jury that "the headlights cannot be definitively examined by experts for purposes of this trial, because although the headlights were removed from the police vehicle for purposes of examination after the accident, the town of Orangetown Police Department failed to safeguard the headlights, and destroyed them;"

(4) instruct the jury that they "may conclude, but do not have to conclude, that the destruction of the headlights was in bad faith, and that such destruction was

done because an examination may have concluded that the headlights were, in fact, off at the time of the accident;"

(5)   permit the plaintiffs "to present expert testimony to the effect that an examination could have been conducted which would have led to a conclusion about whether the headlights were on or off at the time of the accident";

(6)   preclude the police department to offer any evidence "about the reasons for the destruction of evidence, or the circumstances surrounding such destruction;" and,

(7)   award plaintiffs costs for all the time expended in seeking to resolve the issue of the destroyed evidence. *Id*., 84.

Plaintiff submits that it would be appropriate to consider imposing very similar sanctions as in *Donato* and *Unigard* to level the playing field in this case, in the event that the court decides against striking the answers and entering the default judgment against the responsible parties.

**3.     CONCLUSION.**

Plaintiff has set forth the law and facts herein to support the Court's finding that the incident video was critical evidence that was wilfully destroyed in violation of an affirmative duty established by CDCR, California law, federal case law and common sense.  Therefore, Plaintiff respectfully requests that the Court impose, the following sanctions:

(1)   striking the answer of the State of California, the California Department of corrections and Rehabilitation ("CDCR") and Superintendent Nuñez; or, in the alternative:

(2)   excluding any testimony or reference by any State witness, including experts to any written or oral  hearsay statement that purports to interpret or describe the incident depicted in the destroyed incident video during the remaining pre-trial motions or at trial of this action;

(3)    a curative instruction to the jury that the Defendants had a duty to preserve the incident video, but they failed to do so or it was destroyed, and if the video were viewed, it would depict the events which corroborate the Plaintiff's testimony of how the incident occurred;

(4)    an order precluding the defendants to offer any evidence about the reasons for, or the circumstances surrounding, the destruction or failure to preserve the evidence; and,

(5)    an order allowing plaintiff to submit a bill of costs for all the time expended in seeking to resolve the issue of the destroyed evidence.

Dated: July 14, 2008                     Respectfully submitted,

**LAW OFFICES OF R. SAMUEL PAZ**

By:      S/S R. Samuel Paz
R. Samuel Paz, Co-Counsel for Plaintiffs

1  Ronald O. Kaye Esq. (Bar Number 145051)
   KAYE, McLANE & BEDNARSKI
2  128 N. Fair Oaks Avenue
   Pasadena CA 91103
3  Telephone: (626) 844-7660
   Facsimile: (626) 844-7670
4  E-mail: rok_kmb@earthlink.net

5  R. Samuel Paz (Bar Number 62373)
   LAW OFFICES OF R. SAMUEL PAZ
6  Buckingham Heights
   5701 West Slauson Ave., Suite 202
7  Culver City, CA 90230
   Telephone:  (310) 410-2981
8  Facsimile:  (310) 410-2957
   samuelpaz@msn.com
9
   Co-counsel for Plaintiff Nina Morris
10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13
   NINA MORRIS,                    )  CASE NO. CV 07-03101 PJW
14                                  )
                    Plaintiff,      )  [District Judge John F. Walter]
15                                  )
                                    )  **NOTICE OF MOTION AND MOTION**
16 v.                               )  **TO STRIKE THE DEFENDANTS'**
                                    )  **ANSWER OR OTHER**
17 CALIFORNIA DEPARTMENT OF         )  **APPROPRIATE SANCTIONS FOR**
   CORRECTIONS, et al.,             )  **THE DESTRUCTION OF CRITICAL**
18                                  )  **EVIDENCE; MEMORANDUM OF**
                    Defendants.     )  **POINTS AND AUTHORITIES;**
19                                  )  **DECLARATION OF R. SAMUEL PAZ.**
                                    )
20 _____ )
                                       Hearing Date:      August 4, 2008
21                                     Hearing time:      1:30 p.m.
                                       Courtroom:         16
22                                     Pre-Trial Conf.:   October 31, 2008
                                       Trial:             November 18, 2008
23
24 **TO THE STATE OF CALIFORNIA, ALL PARTIES AND THEIR**

25 **ATTORNEYS OF RECORD**:

26       PLEASE TAKE NOTICE that on August 4, 2008, at 1:30 p.m., before the

27 Honorable John F. Walter, Judge of the Central District of California, in Courtroom

28 16, United States District Court, 312 N. Spring Street, Los Angeles, California 90012,

1   Plaintiffs will move the Court for an Order striking the Answers of the responsible

2   Defendants, or other appropriate sanctions.

3        The grounds for this motion is that the Defendant State of California's

4   command staff at the California Youth Authority's Ventura County facility including

5   the Superintendent, Assistant Superintendent, Chief of Security and the Watch

6   Commander who investigated the Plaintiff's complaints of excessive use of force by

7   Defendant KASHA CLEMONS ("CLEMONS") destroyed and/or failed to preserve a

8   videotape taken at the scene of the use of force incident that was later used in the

9   administrative investigation to absolve Defendant CLEMONS of administrative

10  discipline, and is now the basis for the Watch Commander's, Assistant

11  Superintendent's and Superintendent's hearsay testimony of how the incident

12  occurred.

13       Further grounds for this motion are that California and federal law impose a

14  duty to preserve critical evidence before litigation begins or before a discovery

15  request.  This duty requires a litigant to preserve what evidence it knows, or

16  reasonably should know, will be critical in a pending action or one in the offing.

17  Additionally, the watch commander and all command staff, including the Chief of

18  Security, Assistant Superintendent and Superintendent are required by California

19  Department of Corrections policy and procedure to ensure the videotape evidence is

20  booked into evidence and to preserve all videotapes of use of force incidents for five

21  years for the protection of the Department of Corrections from liability and for the

22  protection of juvenile wards in their custody.

23                          **LOCAL RULE 7-3 COMPLIANCE**

24       On April 24, 2008, the plaintiff's counsel set forth in a letter the request to meet

25  and confer in compliance with Local Rule 7-3 on the filing of Plaintiff's Motion for

26  Dismissal or other appropriate sanctions for destruction of evidence.  It set forth the

27  facts and authority relied upon.  On April 28 through April 30, 2008, the parties

28

1   discussed the matters on a number of occasions and were unable to resolve the issues

2   without the assistance of the court.

3          This motion is based on this notice, the attached memorandum of points and

4   authorities, the pleadings and papers on file in this action, and such other oral and

5   documentary evidence as may be allowed at the hearing of this motion.

6   Dated: July 14, 2008              LAW OFFICES OF R. SAMUEL PAZ

7
                                      By _____
8                                                      S/S
                                              R. Samuel Paz Esq.,
9                                      Attorney for Plaintiff Nina Morris

10
    Dated: July 14,  2008                    KAYE, McLANE & BEDNARSKI
11
                                      By_____
12   -                                                 S/S

13                                            Ronald O. Kaye,  Esq.
                                       Attorney for Plaintiff Nina Morris

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              3

# TABLE OF CONTENTS

TABLE OF AUTHORITIES CITED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

POINTS AND AUTHORITIES IN SUPPORT  . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    1.    INTRODUCTION AND BACKGROUND FACTS  . . . . . . . . . . . . .  1

        A.    Introduction and Relief Sought  . . . . . . . . . . . . . . . . . . . . . . .  1

        B.    The Excessive Force Incident  . . . . . . . . . . . . . . . . . . . . . . . .  2

        C.    The Incident Videotape Was Recorded and Initially
              Preserved as Evidence in the Course of an Investigation  . . . .  3

        D.    Lt. Harper's Depiction of the Incident Videotape in
              Her Report is Suspect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        E.    Although Obligated to View the Incident Videotape to
              Resolve the Conflicting Versions, No Supervisor Does So. . . .6

            1.    The Chief of Security Abandoned his Duty to Review
                 and Preserve the Critical Evidence  . . . . . . . . . . . . . . . .  6

            2.    The Superintendent Abandoned His Duty to Review
                 and Preserve the Critical Evidence. . . . . . . . . . . . . . . . .  8

            3.    The Assistant Superintendent Abandoned his Duty
                 to Review and Preserve the Critical Evidence . . . . . . . .  9

            4.    Every Supervisor Linked to the Review of the
                 Incident Violated CDCR Policy Requiring That They
                 Review and Preserve the Critical Evidence . . . . . . . . .  10

        F.    The Defendants Violated the Mandatory CDCR Policy to
              Preserve and Maintain Videotapes of Use of Force Incidents
              for Five Years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    2.    THE DESTRUCTION/FAILURE TO PRESERVE THE
        CRITICAL EVIDENCE RECORDED DURING THE
        ACTUAL INCIDENT REQUIRES STRIKING
        DEFENDANTS' ANSWERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

        A.    The Defendants Were under a Federal Duty to Preserve
              the Incident Video  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

        B.    Destruction of the Incident Video Satisfies the Factors for
              Striking the Answer and Entering a Default  . . . . . . . . . . . . .  12

            1.    Willfulness, Fault or Bad Faith  . . . . . . . . . . . . . . . . . .  13

i

1

## <u>TABLE OF CONTENTS CONT.</u>

2      2.    The Public's Interest in Expeditious Resolution of
             Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3      3.    Prejudice to the Plaintiff . . . . . . . . . . . . . . . . . . . . . . . 15

4      4.    Policy Favoring Disposition on the Merits . . . . . . . . 16

5      5.    Availability of less Drastic Sanctions . . . . . . . . . . . . 16

6   C.   Exclusion of Evidence, Appropriate Jury Instructions and
        an Award of Costs Are Appropriate Sanctions When
        Spoliation Deprives a Party of an Opportunity to Inspect the
        Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ii

1

## <u>TABLE OF AUTHORITIES</u>

2

3

### FEDERAL CASES

4

5  *Anheuser-Busch, Inc. v. Natural Beverage Distributors*,

6      69 F.3d 337 (9th Cir. 1995) ...................................................... 11

7  *Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................... 13

8  *Burge v. St. Tammany Parish*, 187 F.3d 452 (5th Cir. 1999) ..................... 13

9  *Computer Associate International, Inc. v. American Fundware, Inc.*,

10      133 F.R.D. 166 (DC Co.1990) ................................................ 12

11  *Donato v. Fitzgibbons*, 172 F.R.D. 75 (D.C.N.Y. 1997) ........................... 18

12  *Halaco Engineering Co. v. Castle*, 843 F.2d 376 (9th Cir. 1988) .............. 18

13  *Kounelis v. Sherrer*, 529 F. Supp. 2d 503 (D.C. N.J. 2008) ...................... 12

14  *Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006) .................. 11, 12

15  *MOSAID Techs. Inc. v. Samsung Electrics Co.*,

16      348 F. Supp. 2d 332 (D.N.J. 2004) ........................................ 12

17  *Malone v. U.S. Postal Service*, 833 F.2d 128 (9th Cir. 1987) .................... 16

18  *McCann v. Mangialardi*, 319 F.3d 301 (7th Cir. 2003) ............................ 13

19  *Newsome v. McCabe*, 337 F.3d 782 (7th Cir. 2003) .................................. 13

20  *Unigard Security Insurance Co. v. Lakewood Engineering &*

21      *Manufacturing Corp.*, 982 F.2d 363 (9th Cir. 1992) ............................ 17

22  *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Construction Co.*,

23      857 F.2d 600 (9th Cir. 1988) ................................................ 12

24  *Wm. T. Thompson  Co. v General Nutrition Corp.*, 593 F. Supp. 1443 (CD

25      Cal.1984) ............................................................... 11

26

27

28

1

## <u>TABLE OF AUTHORITIES CONT.</u>

2

3

### FEDERAL STATUTES

4

5

42 U.S.C. § 1983 ............................................................................. 2

6

7

### STATE STATUTES

8

9

Cal. Penal C. § 135 .......................................................................... 14

10

Cal. Penal Code § 242. ..................................................................... 13

11

Cal. Govt C. § 910 ........................................................................... 14

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**POINTS AND AUTHORITIES IN SUPPORT**

**1.     INTRODUCTION AND BACKGROUND FACTS.**

     **A.     Introduction and Relief Sought.**

     Plaintiff brings this motion to seek appropriate sanctions for the apparent intentional destruction or wilful failure to preserve a videotape of the actual incident of the use of force, the most central and fundamental evidence of the case, akin to the blood sample of the defendant in a criminal prosecution for the charge of driving under the influence.  As a result of a series of violations of mandatory policy and procedures of the California Department of Corrections and Rehabilitation ("CDCR"), Plaintiff NINA MORRIS has been deprived of access to the quintessential, indisputable evidence corroborating her excessive force claim.  With this evidence, the jury would have had the vantage point to accurately assess what actually occurred.  Now that the evidence is gone, all the jury has is the dispute between the recollection of interested parties; a dispute where inherently MORRIS is at a disadvantage before the jury challenging the testimony of a number of law enforcement officials in a position of authority.

     Plaintiff seeks the imposition of sanctions of: (1) striking the answers of the State of California, CDCR and Superintendent NUÑEZ; or, in the alternative, (2) excluding any testimony or reference by any State witnesses, including experts, to any written or oral hearsay statement that purports to interpret or describe the incident depicted in the destroyed videotape of the incident ("incident video") during the remaining pre-trial motions or trial of this action; (3) imposing a curative instruction such that the jury will be instructed that the Defendants had an affirmative duty under the law to preserve the incident video, but they failed to do so, or it was destroyed, and if the video were viewed, it would depict the events which corroborate the Plaintiff's testimony of how the incident occurred; (4) precluding the Defendants to offer any evidence about the reasons for, or the circumstances surrounding, the destruction or failure to preserve the evidence; and, (5) an order awarding Plaintiff

1

costs for all the time expended in seeking to resolve the issue of the destroyed evidence.

Plaintiff NINA MORRIS, who is presently age 21 years, is a resident of Riverside County, and brings this action for violations of civil rights under 42 U.S.C. § 1983 alleging claims of excessive force against CLEMONS, a youth correctional counselor ("YCC"), and supervisory liability against then Superintendent of the Ventura Youth Correctional Facility ("VYCF"), RUBEN NUÑEZ.  Plaintiff also alleges state claims of battery and negligence against the STATE OF CALIFORNIA and CLEMONS.  MORRIS was a California Youth Authority ("CYA") ward housed in Ventura Youth Correctional Facility ("VYCF") on October 30, 2006 at the time of the incident which gives rise to these claims.  Shortly thereafter, she was released from custody.

**B.    The Excessive Force Incident.**[1]

On October 30, 2006, between 6:30 and 7:00 a.m., NINA MORRIS, had gone to breakfast and was returning to her room located in Miramar Housing Unit with the rest of the female wards in her housing unit.  She and another girl stopped in the hallway near her room and were looking at the day's assignments for academic classes posted on the wall.  As they started to leave to go to their rooms,  another ward, Vanessa Huerta, without warning, ran from the doorway of her room towards MORRIS and attacked her by swinging her fists.  MORRIS was hit in the face a few times and defended herself by pushing Huerta away, causing Huerta to fall on her buttocks.  The blows did not hurt MORRIS.

---

[1]  The facts of how the altercation between the wards developed, that Defendant CLEMONS came running to intervene, used pepper spray, used force, and the seriousness of the fracture suffered by Morris in the incident are not in dispute.  Defendants do dispute that the force was unnecessary or excessive.

1
2
3
4
5
6
7
8
9
10

MORRIS then restrained Huerta by standing and leaning down and forward over Huerta with both of her hands holding ward Huerta's arms down near Huerta's upper arms and shoulders, so as to not be hit in the face, while Huerta, with her back on the floor, continued to swing her arms at MORRIS's chest and face, but did not hit her.  Within seconds, CLEMONS, ran up to MORRIS and Huerta and began to spray O.C. (pepper spray) at them.  Before he determined whether the girls would separate after the application of the pepper spray, CLEMONS struck MORRIS violently and caused multiple fractures of Plaintiff's right clavicle, and in doing so, used excessive force against MORRIS.  CLEMONS is a former high school and college athlete who is very muscular, weighing 235 lbs., and standing 5'8".

11
12
13

Thereafter, MORRIS was taken to the VYCF Medical Clinic for a severely fractured clavicle, and later underwent surgical repair with internal fixation devices, a metal plate and screws.  She sustained permanent injuries, scaring and disfigurement.

14
15

## C.   The Incident Videotape Was Recorded and Initially Preserved as Evidence in the Course of an Investigation.

16
17
18
19
20
21
22
23
24
25
26

The incident where CLEMONS violently struck the shoulder of MORRIS causing a severe fracture of the clavicle was videotaped by one of the many stationary cameras installed in the housing areas for female wards.  These stationary cameras were placed in the facility precisely for the purpose of capturing incidents of altercations and problems between wards, and wards and staff.  The cameras are (*inter alia*) to "[A]ide in the investigation of alleged inappropriate activities of staff." (*See* Exhibit 1, "Living Unit Digital Video Surveillance Policy, General Policy, Purposes, AGO 484-485.)  The attached photograph depicts that the camera in the housing unit is directly above where the incident occurred.  (*See* Exhibit 2, photo of "Hall A" in the Miramar Housing Unit, and declaration of R. Samuel Paz, attached hereto.)

27
28

1    It is without dispute that the actual incident of CLEMONS using force on

2    MORRIS was captured by the security camera and recorded in a video recording[2] and

3    that the incident video recording was reviewed by Lt. Harper, the duty Watch

4    Commander.  It is also without dispute that Lt. Harper's written interpretation of the

5    incident video (*see* Exhibit 3, Report of Harper, stamped AGO 138, 139, 140 & 141)

6    was relied upon by the Chief of Security, the Assistant Superintendent, the

7    Superintendent and the Institutional Force Review Committee ("IFRC") in their

8    review of incident.  Although required to do so by CDCR policy and procedures

9    (discussed below), according to the deposition testimony of each of these witnesses,

10   **no one**, other than Lt. Harper, saw the incident video prior to its destruction or loss.

11   On November 3, 2006, four days after the incident, Lt. Harper conducted an

12   interview with MORRIS.  That interview was videotaped by a hand-held camera.  In

13   the written report, Lt. Harper affirmatively stated "Yes" in response to the question

14   whether the "videotape**s** [plural] were processed as evidence." (*See* Exhibit 3, AGO

15   139, emphasis added.)  Thus, both videotapes, the incident video recorded in the

16   housing unit on October 30, 2006 and the interview video, recorded on November 3,

17   2006, were booked into evidence and made available to be viewed by the Chief of

18   Security, the Assistant Superintendent and the Superintendent.

19   \\

20   \\

21

22   _____

[2]   As used in this motion, the "videotape" that the documents produced in
23   discovery by the defense refer to is actually an electronic CD-ROM or DVD
24   disk recording that is prepared from a computer hard drive video monitoring
     system that records from the fixed camera stations in the facility.  These
25   recordings are preserved for 30 days and routinely downloaded to a DVD
26   disk in the event of a "significant incident" such as a use of force as
     required by CYA policy.  *See* Exhibit 1, "Procedures" and Exhibit 7, DT
27   Dwayne Johnson p. 18:15 - 19:3.

28

4

**D.    Lt. Harper's Depiction of the Incident Videotape in Her Report is Suspect.**

In the videotaped interview on November 3, 2006, MORRIS directly states that her clavicle was fractured at the moment when CLEMONS "slammed" her shoulder as she stood in the hallway, then she fell.[3] Lt. Harper documented that statement in her report that MORRIS told her that the fracture to the bone occurred when "Clemons grabbed her shoulder." (*See* Exhibit 3, AGO 139.)  Under the CYA's Policy on Use of Force, this was a significant injury due to an application of use of force and constituted a complaint by MORRIS of excessive force.[4]  Yet Lt. Harper, relying solely on her interpretation of the now destroyed videotape of the incident, in her "Report of Findings" as required by the CYA, stated:

> Video of incident shows that YCC Clemons did not fall on top of the ward but did appear to grab her shirt as he separated combatants.  Ward appears to fall on her right shoulder as she is pulled away. YCC Clemons (sic) written report is consistent with the video. (*See* Exhibit 3 pgs. 139, 140 & 141.)

In her evaluation, Lt. Harper relies solely[5] on the "video of the incident" and concludes that there was no excessive force, essentially ignoring MORRIS' accusation that the force used by CLEMONS directly to her shoulder broke her bone. Therefore, Lt. Harper concluded that MORRIS' injury stemmed from her fall.

---

[3]  November 3, 2006, Video Interview of MORRIS available in DVD Format for the Court's review.

[4]  *See* Exhibit 3, pg. AGO 138, Ward Interview Format re-use of force, "I., 1-3."

[5]  In her deposition, when confronted with the proposition that she espouses in her report "that MORRIS appears to fall on her right shoulder" and that is how she was hurt, Lt. Harper admitted that she never spoke to CLEMONS during her review, and never asked him if MORRIS was injured by his hitting her, or by a fall. (*See* Exhibit 4, Deposition Transcript ("DT") Harper p. 32:19-24)

Harper then retreated from the conclusion that MORRIS fractured her bone from a fall and stated:

> In the report to the Chief, it doesn't make the conclusion that she injured her shoulder when she fell to the floor.  It only shows that – I only shows that – I only said that, "the ward appears to fall on her right shoulder when she was pulled away." (*See* Exhibit 4, DT Harper pp. 32:25-33:1-6.)

Later in the deposition, Lt. Harper totally withdrew her opinion that the injury was caused by a fall calling it "irrelevant" and then further retreated stating that how MORRIS was injured "wouldn't have been my focus in this particular incident." (See Exhibit 4, pp. 33:33:7-10 and 34:20-35:1-23.)

Thus, when challenged about the accuracy of her conclusions from her review of the now unavailable videotape, Lt. Harper appears unsure of what she saw.  Lt. Harper's failure to stand by her conclusion about the cause of MORRIS's injury reveals the likelihood that the video in fact did not depict what Lt. Harper suggests: MORRIS did not fall on her right shoulder.

Moreover, the accuracy of Lt. Harper's depiction of the videotape is further undermined by the deposition statement of CLEMONS (and the testimony of the Plaintiff) that after CLEMONS struck MORRIS she fell on **her left shoulder** and not her right shoulder as asserted by Lt. Harper.  (*See* Exhibit 5, DT Clemons p. 47:16-20, 48:2-4 and 48:13-23.)

Unfortunately, or perhaps conveniently for the Defendants, the videotape is destroyed, and the unequivocal evidence of what occurred is unavailable.

**E.    Although Obligated to View the Incident Videotape to Resolve the Conflicting Versions, No Supervisor Does So.**

**1.    The Chief of Security Abandoned his Duty to Review and Preserve the Critical Evidence .**

The Policy on the Supervisory Review of Use of Force instructs the Watch Commander that "All videotapes related to the incident . . . are forwarded to the Chief

6

1   of Security **for review**." (*See* Exhibit 6, "V. Evaluating the Use of Force; A.

2   Supervisory Evaluation AGO 261-262, emphasis added.)   The Chief of Security,

3   Dwayne Johnson, was required to review the Watch Commander's reports to "ensure

4   the quality of the report for accuracy and **credibility**." (*See* Id., AGO 262-263,

5   emphasis added.)  However, it was his testimony, that although he approved Lt.

6   Harper's conclusions and "concurred with the watch commander's recommendations"

7   he admitted **he never saw the videotape** Lt. Harper relied upon, and had no basis to

8   know if she was truthful or accurate. (*See* Exhibit 7, DT Johnson, p. 21:10-25-22:1-

9   25.)  Johnson admitted "I've never seen the video" of the incident, although required

10  to do so by policy and procedure.  (*See* Exhibit 7, p. 25:23-26:1-17.)  When asked

11  who started the altercation, Johnson stated that he did not know without seeing the

12  videotape.  And he admitted that neither could he determine whether the force used

13  by CLEMONS was excessive and violated policy and MORRIS' rights.  "Without

14  viewing the video, I can't tell you if it was excessive or not." (*See* Exhibit 7, p. 30:5-

15  24.)

16      The Chief of Security further testified it was the responsibility of the Watch

17  Commander to preserve the videotape as evidence. (*See* Exhibit 7, p. 18:15-25-19:1-3

18  and 23:1-7.)  Furthermore, the Chief of Security testified that there was no

19  documentation in the entire record of this incident or in the supervisor's review, that

20  presented any explanation or reason why the videotape was not preserved.  (*See*

21  Exhibit 7, p. 23:8-20.)  This testimony is very important in light of the Chief of

22  Security's responsibilities for the equipment that recorded the use of force incident.

23      The Chief of Security is required to ensure that (1) "the digital video

24  surveillance equipment is maintained and in proper working order on a daily basis"

25  and (2) to ensure that videos (CD-ROMS) "that have been downloaded (recorded)

26  after an incident will be stored in accordance with the rules of evidence." (Exhibit 1,

27  pg. AGO 485.)   The Chief of Security's daily duty to ensure the digital video

28  surveillance equipment "is maintained and in proper working order" is parallel to the

7

First Watch Lieutenant's responsible to ensure that "each living unit digital video surveillance equipment is maintained and in proper working order on a daily basis." (Exhibit 1, AGO 485.)  Furthermore, the Watch Lieutenant is responsible to "report any problems with the digital video surveillance equipment to the Chief of Security no later than the next watch via e-mail"; "submit appropriate work orders to correct the problem"; and "denote steps taken in the duty lieutenant logbook and the video surveillance logbook." (Id., AGO 485.)   The Chief of Security testified that there is no evidence or documentation that the equipment failed or that there was any difficulty in downloading the incident videotape or that it was not recorded.  (*See* Exhibit 7, p. 23:8-20.

2.     **The Superintendent Abandoned His Duty to Review and Preserve the Critical Evidence.**

Defendant Superintendent NUÑEZ testified that he began working in 1998 at VYFC the Chief of Security, was advanced to Assistant Superintendent in 2001 and became the Superintendent (the highest ranking command supervisory position) of VYFC during 2003 and 2004.  (*See* Exhibit 8, DT Nuñez, p. 8:1-19.) He was the Superintendent present at VYCF on October 30, 2006, at the time MORRIS was injured, (*See* Exhibit 8, pp. 13:1-9 & 26:11-15) and went to interview MORRIS in the VYCF hospital-clinic immediately after her shoulder was broken.  (*See* Exhibit 8, pp 13:23-14:1-7.)

NUÑEZ explained that when a use of force incident is videotaped and the Watch Commander reports affirmatively that the "Videotapes processed as evidence," that it begins a review of the incident which culminates with the review of the "Institutional Force Review Committee," ("IFRC") "and **it's the superintendents's responsibility to review all of the use of force videos.**"  (*See* Exhibit 8, p. 20;11-21, emphasis added.)

The process whereby the superintendent would obtain the video is a relatively simple one.  If the superintendent was notified of an incident, especially a critical one,

8

such as MORRIS' injury requiring off-facility emergency hospitalization and surgery, the Local Area Network Manager would be notified and a disk copy of the incident would be made and "turned over to the superintendent." Consequently, the superintendent would have the opportunity to review it on a computer monitor. (*See* Exhibit 8, 22:7-24 & 25:11-21.) Yet, NUÑEZ was not even aware that the destroyed videotape had been made (*id.*, pp. 19:23-25) and had no memory of ever reviewing the videotape of the incident. (*See* Exhibit 8, 28:5-8 & 29:8-13.)

### 3. The Assistant Superintendent Abandoned his Duty to Review and Preserve the Critical Evidence.

David Finley, the "acting" Superintendent at the time of the incident while Superintendent NUÑEZ was still on the job (Exhibit 9, DT David Finley pg. 5:4-6:3) and he reviewed and approved Lt. Harpers report (Exhibit 3) on three separate occasions. As part of the review, he was the ranking person at the IFRC, along with Dwayne Johnson, the Chief of Security and five other senior staff persons meeting on November 15, 2006 to review the incident, only two weeks after CLEMONS' use of force on MORRIS. Their conclusion echoed Lt. Harper's unsupported speculation that MORRIS "landed on her right shoulder," totally ignoring MORRIS' video and audio tape recorded assertion that she was injured when CLEMONS "slammed" her. (Exhibit 10, "IFRC Review and Analysis AGO 527.) Notwithstanding the obvious conflict between the statements of MORRIS and Lt. Harper, the IFRC abandoned their collective duty to review the incident video. (Exhibit 9, DT David Finley pg. 41:16 - 42:3.) Finley was fully aware at the time he signed and approved the IFRC's Review and Analysis on November 15, 2006, that if the incident video was "lost, destroyed or not properly booked into evidence," that there was "plenty of time to go and request another copy be made." (*Id.*, pg. 42:16-24.) Finley never requested another copy of the incident video.

On November 5, 2006, he reviewed the packet of materials collected during the investigation entitled the "Use of Force Incident Review," whose purpose "is used to

9

review the entire incident and which he signed and approved." (Exhibit 9, DT David Finley pg. 18:3-26.)  From his review, Finley knew that MORRIS had stated that when CLEMONS hit her shoulder, that is when it broke.  (*Id.*, pg. 33:12-34:5.)  Yet, he never asked CLEMONS where he hit MORRIS. (*Id.*, pg. 33:2-11).

Finley abandoned his duty to review the incident video that Lt. Harper recorded and preserved as evidence although he reviewed and approved the Use of Force Incident Review on November 5, 7, and again on November 15, 2006.  (Exhibit 9, DT David Finley pgs. 34:6 - 35:2; 35:9 - 37:1 & 37:2-24.)

> **4.** **Every Supervisor Linked to the Review of the Incident Violated CDCR Policy Requiring That They Review and Preserve the Critical Evidence .**

Each of these Supervisors were obligated to follow the CDCR policy on the Monitoring of Use of Force which requires that:

> On at least a monthly basis the Institutional Force Review Committee shall meet to review all completed use of force incidents after critique of area managers.  The IFRC shall examine all levels of responsibility exercised by subordinate managers and supervisors **and ensure the appropriateness of completed documentation**.  The IFRC shall make a determination concerning the appropriateness of the use of force based upon the information and reports available.
>
> **All superintendent/assistant superintendent shall personally view all videotapes arising from use of force incidents**. (*See* Exhibit 11, "VI. Monitoring of Use of Force, AGO 264, emphasis added.)

Thus, every supervisor is mandated by CDCR policy and procedure to view the use of force incident videotape.  By failing to do so, they  violated the policy and procedure created to insure the integrity of the investigation, and essentially ignored **the most critical evidence of what actually occurred.**  The Defendants cannot now

defend themselves based upon Lt. Harper's *post hoc* interpretations of what was on the incident videotape which no one can corroborate.

**F.     The Defendants Violated the Mandatory CDCR Policy to Preserve and Maintain Videotapes of Use of Force Incidents for Five Years.**

The policy on Use of Force mandates that the Chief of Security at each CYA facility is *required* to maintain a database containing use of force.  The policy requires that "*All videotapes that record the use of force by staff shall be maintained for a period of five years*."  (*See* Exhibit 11, AGO 265, emphasis in the original.)

Moreover, when a ward accuses a staff member of excessive use of force as in this case, the necessity for the preservation of the evidence is twofold: (1) to protect the staff and YA from unsupported accusations, (2) to protect the ward from excessive force or criminal conduct by staff.  Thus, the destruction or loss of the incident videotape by the Defendants responsible under the law and by their policies and procedures to preserve this critical evidence leaves the Plaintiff with the inability to prove that she is truthful and to impeach the Defendants.

**2.     THE DESTRUCTION/FAILURE TO PRESERVE THE CRITICAL EVIDENCE RECORDED DURING THE ACTUAL INCIDENT REQUIRES STRIKING DEFENDANTS' ANSWERS.**

**A.     The Defendants Were under a Federal Duty to Preserve the Incident Video.**

Federal law imposes a duty to preserve critical evidence before litigation begins or before a discovery request.  This duty requires a litigant to preserve what it knows, or reasonably should know, will be critical evidence in a pending action or one in the offing. *See Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995) (dismissal proper where conduct sanctioned is based on willfulness, fault, or bad faith.); *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (destruction of computer files by the plaintiff alleging, *inter alia*, violations of the anti-retaliation provision of the False Claims Act, in accord); and *Wm. T. Thompson*

*Co. v  General Nutrition Corp.*, 593 F. Supp. 1443, 1156 (CD Cal.1984)(approving striking answer and entering default as a sanction for destruction of books and computer files central to an anti-trust action).

Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *MOSAID Techs. Inc. v. Samsung Elecs*. Co., 348 F. Supp. 2d 332, 335 (D.N.J. 2004). Spoliation occurs when a party has intentionally or negligently breached its duty to preserve potentially discoverable evidence. *Id*., cited with approval in *Kounelis v. Sherrer*, 529 F. Supp. 2d 503 (D.C. N.J. 2008).   *See also Computer Assoc. Int'l, Inc. v. American Fundware, Inc.*, 133 FRD 166, 170 (DC Co.1990) (defendant's wilful destruction of source code for defendant's program supported a default sanction).

The duty to preserve evidence is implied from public policy: "Destruction of evidence cannot be countenanced in a judicial system whose goal is to find the truth through honest and orderly production of evidence under established discovery rules." *Id*.

### B.   Destruction of the Incident Video Satisfies the Factors for Striking the Answer and Entering a Default.

For dismissal to be proper, the conduct to be sanctioned must be due to willfulness, fault, or bad faith. *Anheuser-Busch*, *supra* at 348.  Before imposing the "harsh sanction" of dismissal, the district court should consider the following factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.  *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). While a district court need not make explicit findings regarding each of these factors, *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 603

(9th Cir. 1988), a finding of "willfulness, fault, or bad faith" is required for dismissal to be proper. *Anheuser-Busch*, at 348.

### 1.    Willfulness, Fault or Bad Faith.

A party's destruction of evidence qualifies as **wilful** spoliation if the party has some notice that the evidence was potentially relevant to the litigation before it was destroyed. *Leon*, at 959.  As one of the largest juvenile justice systems in the world, Defendants are sophisticated litigants aware of their obligation to preserve relevant evidence.  Every officer and employee is keenly aware of the duty to preserve evidence taken at the scene of an alleged crime, as here, Battery (Cal. Penal C. § 242). *See generally,* Cal. Commission of Peace Officer Standards and Training, Learning Domain 30 "Primary Investigation, Version 3, Chapter 2, "Evidence Collection." pub. 1997, revised 2006.

Further, it is common knowledge in law enforcement that in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the U.S. Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  Police officers nationwide know that they can held liable for *Brady* violations.[6]

---

[6]    *See e.g.*, *Burge v. St. Tammany Parish*, 187 F.3d 452, 479-480 (5th Cir. 1999) (affirming district court's denied deputy's motion for summary judgment on qualified immunity grounds, plaintiff later obtained a jury verdict for $ 4,075,000 in damages against deputy at trial and did not appeal. *Burge v. St. Tammany Parish Sheriff's Office*, 2001 WL 845463, at 1 (E.D. La. 2001).  See also *McCann v. Mangialardi*, 319 F.3d 301, 303 (7th Cir. 2003) (suppression of exculpatory evidence by police officers requires recognizing a cause of action against the officers*). Newsome v. McCabe*, 337 F.3d 782, 787 (7th Cir. 2003) (jury award of $15 million in damages for suppression of evidence).

Defendant NUÑEZ and the rest of the command staff were fully aware that the incident video of MORRIS and CLEMONS, and the eye witnesses present at the time CLEMONS used force on MORRIS, would be the central focus of an administrative, and possibly, a criminal investigation and prosecution.  It became even more central to any inquiry when MORRIS was found, by the doctors at St. Johns, an outside medical facility, to have suffered a serious, life altering injury requiring surgery.  It became even more evident when MORRIS was, only with the permission of the Defendants, visited by counsel R. Samuel Paz at VYCF, and shortly thereafter, a Claim for Damages was filed by MORRIS with the Defendants in compliance with Cal. Govt C. § 910.  Despite being aware of the need to preserve the at-scene evidence of the incident, and that the Plaintiff would proceed with litigation, Defendants failed to preserve or destroyed the incident video.[7]

Further, the inconsistent testimony of Lt. Harper about what the video depicted and how MORRIS injured herself – testimony which is contradicted by CLEMONS and MORRIS who both state MORRIS fell on her left shoulder, should raise serious concern for the Court.  The failure to preserve **the critical evidence** of the incident – the videotape, which appears to have been misrepresented by **the only witness** who purportedly reviewed it, reveals the wilfulness, the bad faith, or at minimum, the gross negligence of the Defendants.

### 2.        The Public's Interest in Expeditious Resolution of Litigation.

The first and second factors support striking the answer, appropriate sanctions and denying summary judgment when the destruction of evidence "obscur[es] the factual predicate of the case and consum[es] months of sanction-related litigation." *Leon*, at 958 n.5.  Defendants' spoliation of the at-scene evidence obscures and

---

[7]  It is noteworthy that it is a crime, under California law, to wilfully "destroy or conceal" anything that is to be produced as "evidence upon any trial, inquiry **or investigation** whatsoever authorized by law." Cal. Penal C. § 135 (emphasis added).

affects the very heart of the matter in dispute: whether CLEMONS used excessive force.  Defendants deny this, but destruction of the first hand account of what occurred deprived Plaintiff of this critical and much more reliable evidence. Destruction of the at-scene evidence has obscured the factual predicate of the case, and Plaintiff's counsel has spent significant resources investigating and resolving the spoliation issues. The first two factors therefore support dismissal.

### 3.      Prejudice to the Plaintiff.

A party suffers prejudice if the opposing party's actions impair the party's ability to go to trial or threatens to interfere with the rightful decision of the case. *Anheuser-Busch*, at 353-54 (citations omitted).  Whether CLEMONS used excessive force would have been determined by the incident video, primary evidence of what actually occurred.  Plaintiff and their experts have been deprived of the ability to determine whether the critical evidence would have supported their theory of the case.  Prejudice was found in *Anheuser-Busch* when the suppression of documents "forced Anheuser to rely on incomplete and spotty evidence." Id.

In this case, the destruction of the at-scene evidence forces Plaintiffs to rely on secondary evidence preserved by Defendant, post-incident self-serving reports and depositions of admittedly biased witnesses.  Video evidence which Plaintiff is confident would have supported her theories of liability and causation were destroyed, and the remaining secondary evidence is wholly incompetent.  Although Plaintiff's experts may be able to present reports and testify based on the evidence preserved from the Defendants' incident and medical reports, there is no doubt that the spoliation in this case forces Plaintiff to "rely on incomplete and spotty evidence." *Anheuser-Busch*, at 353-354.

Not only is the evidence incomplete, but it is inherently biased because it is limited to that which the Defendants chose to preserve.  The spoliation therefore threatens to interfere with the rightful decision of the case by preventing full

15

development of the Plaintiff's theories of liability and causation, and ultimately deprives the Plaintiff of a fair trial.

### 4.      Policy Favoring Disposition on the Merits.

The fourth factor, the public policy favoring disposition of cases on their merits, weighs against dismissal. Standing alone, that factor is not sufficient to outweigh the other factors. *Leon*, at 960-61, quoting *Malone v. U.S. Postal Service*, 833 F.2d 128, 133 n.2 (9th Cir. 1987).  Nor should this Court be inclined to give great weight to this factor when the unilateral wilful conduct of one party's spoliation hinders the parties' ability to investigate and present the merits of this case, and deprives the court of the ability to give the Plaintiffs a fair trial.

### 5.      Availability of less Drastic Sanctions.

Finally, a court must consider the availability of less drastic sanctions.  Short of striking the answer and entering default judgment, Plaintiff urges exclusion of Defendant officers' testimony who rely on the interpretation of the destroyed incident video and any of Defendants' witnesses and experts who rely on this destroyed evidence. Plaintiff also requests, in conjunction with the exclusion of the testimony, that the Court order that an adverse jury instruction advising the jury that the Defendants were under a legal duty to preserve the critical evidence, that they destroyed the critical evidence and that they must presume that the destroyed video supported the Plaintiff's testimony of how the incident occurred.

However, although these lesser sanctions are feasible, they do not cure the prejudice caused to the Plaintiff and to this litigation. Specifically, these lesser sanctions do not address the fact that the wilful conduct of the Defendants has limited the evidence available to the Plaintiff to oppose a motion for summary judgment or to present at trial.  The wilful, if not bad faith, conduct of the Defendants most likely hid the "smoking gun."  If it was helpful to the Defendants, common sense tells anyone that it would be front and center: "Exhibit A" for the defense.

Ultimately, exclusion of evidence is an appropriate sanction when spoliation deprives a party of an opportunity to inspect the evidence.  (*See Unigard Security Ins. Co. v. Lakewood Engineering & Manufacturing Corp.*, 982 F.2d 363, (9th Cir. 1992) discussed in the next section.)  Defendants' destruction of the at-scene evidence in the incident video prevents Plaintiff from developing her theories of liability and damages.  Excluding Defendants' unreliable evidence of what is on the incident video helps to level the evidentiary playing field, but that sanction does not account for the possibility that the video contained additional evidence to support Plaintiff's theories of liability and causation.  An adverse jury instruction, combined with exclusion of evidence, helps to offset the risk that evidence proving liability was lost.

But imposing these two sanctions in tandem would still not cure the fact that Defendant is limited to evidence from the scene that Defendants chose to preserve. Striking the answer of the parties responsible for the destruction of the evidence, the State of California and Superintendent NUÑEZ, entering a default judgment and setting a hearing on damages is the only sanction that addresses this type of prejudice caused by parties who know that CDCR policy, state and federal law mandate the they preserve critical evidence of a serious incident.

**C.**  **Exclusion of Evidence, Appropriate Jury Instructions and an Award of Costs Are Appropriate Sanctions When Spoliation Deprives a Party of an Opportunity to Inspect the Evidence.**

In *Unigard Security Ins. Co. v. Lakewood Engineering & Manufacturing Corp.*, 982 F.2d 363, (9th Cir. 1992), Unigard, the insurer of a large boat, brought subrogation claims against Lakewood Engineering, the manufacturer of an electric space heater that Unigard thought was responsible for the fire that destroyed the vessel. Unigard's claims were dismissed at summary judgment after the district court excluded Unigard's expert witness and other evidence from the boat and heater as a sanction for its having destroyed the heater and the remains of the boat before filing suit. (Id., 365.)

The Ninth Circuit upheld the sanction as part of a district court's inherent powers of the " broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial.  Within this discretion lies the power . . . to exclude testimony of witnesses whose use at trial . . . would unfairly prejudice an opposing party." Id., at 368, *citing Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980).  *Unigard* confirmed the power of the district court to sanction under its inherent powers not only for bad faith, but also for willfulness or fault by the offending party. [Id., at 368, fn 2, emphasis added, *citing Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988)].  In adopting the district court's findings that "Lakewood is precluded from gaining expert testimony related to whether the heater caused the fire," and that "plaintiff's destruction of key evidence renders a full defense impossible," *Unigard* held that "allowing Unigard to introduce the testimony of its experts would unfairly prejudice Lakewood and thus preclude the court's ability to conduct a fair trial." (*Id.*, at 368). Moreover, the court rejected Unigard's argument that an adverse instruction standing alone would have been sufficient stating:

> Unigard's destruction of evidence was not in dispute; it precluded Lakewood from any opportunity to inspect the evidence; and it rendered unreliable virtually all of the evidence that a finder of fact could potentially consider. Given these factors, it was within the district court's discretion to determine that a rebuttable presumption against Unigard would have been insufficient to cure the prejudice arising in the context of this case.

*Donato v. Fitzgibbons*, 172 F.R.D. 75 (D.C.N.Y. 1997) is also instructive.  In that case the defendants, a city police department and its police officers, were involved in a automobile collision, and critical evidence of liability, the headlights of the police vehicle which would reveal whether they were on or off at the time of the collision, was destroyed by the police officers responsible for preserving them.  Id.,

77.  The court concluded "that bad faith is present in the failure to safeguard the evidence . . . ." Id., 80.  The basis for this conclusion was stated as follows:

> The failure of defendant Orangetown to safeguard this evidence is even more egregious because the Orangetown Police Department is, or should be, in the business of insuring that evidence is handled properly. This is not a situation where an organization unaccustomed to the requirements of maintaining chain of custody and retaining important evidence has failed to preserve and protect items relevant to litigation. (Cite omitted.) Rather, the town of Orangetown, through its Police Department, is experienced, and has procedures in place, with regard to retaining and safeguarding evidence. There is no excuse for their failure in this instance. *Id.,* 80.

The court found that "[i]f the property had been connected with a criminal case being prosecuted by the County with the assistance of the Police Department, I am certain that it would not have been handled so cavalierly." *Id.* The court also found that the motive of the police department was rather obvious:

> [I]n this case, the Police Department had no incentive to safeguard the property because they, and one of their officers, were the ones being accused of wrongdoing. Thus, as evidenced by the history of bad faith in the discovery process, I conclude that the intent of those responsible for retaining the evidence was to obfuscate and impede the process at every step. Id.

The court in *Donato* adopted cases where an adverse inference charge "serves two purposes -- remediation and punishment." *Id.*, 81, cites omitted.)  It explained that "[t]he remedial purpose of the sanction serves to place the prejudiced party in the same position with regard to its ability to prove its case as it would have been in if the evidence had not been destroyed." *Id.,* 82.  It also found that the punitive purpose

19

both deters parties from destruction of relevant evidence and directly punishes the party responsible for spoliation stating:

> The law, in hatred of the spoiler, baffles the destroyer, and thwarts his iniquitous purpose, by indulging a presumption which supplies the lost proof, and thus defeats the wrongdoer by the very means he had so confidentially employed to perpetrate the wrong.  Id., *citations omitted*.

In the instant case the same policy reasons apply.  Similar to the police force in Orangetown, the supervisory staff at the CYA are " experienced, and [have] procedures in place, with regard to retaining and safeguarding evidence" particularly procedures for safeguarding videotapes of conduct within the institution – evidence which is critical to assessing criminal culpability or civil liability in a dispute.  And similar to the *Donato* case, with the control of this evidence being fundamental to their roles within the institution, this Court should attribute bad faith to the supervisory staff for the destruction of this critical evidence.

After making its analysis, the *Donato* court assessed that the police department's destruction of the evidence stemmed from "bad faith and gross negligence," and the appropriate sanctions ordered were:

(1)   to "preclude defendant town of Orangetown from submitting any expert testimony whatsoever about the state of the headlights after the accident;

(2)   to preclude a police detective "from testifying about his observations of the headlights and any conclusions he drew;"

(3)   inform the jury that "the headlights cannot be definitively examined by experts for purposes of this trial, because although the headlights were removed from the police vehicle for purposes of examination after the accident, the town of Orangetown Police Department failed to safeguard the headlights, and destroyed them;"

(4)   instruct the jury that they "may conclude, but do not have to conclude, that the destruction of the headlights was in bad faith, and that such destruction was

20

done because an examination may have concluded that the headlights were, in fact, off at the time of the accident;"

(5)     permit the plaintiffs "to present expert testimony to the effect that an examination could have been conducted which would have led to a conclusion about whether the headlights were on or off at the time of the accident";

(6)     preclude the police department to offer any evidence "about the reasons for the destruction of evidence, or the circumstances surrounding such destruction;" and,

(7)     award plaintiffs costs for all the time expended in seeking to resolve the issue of the destroyed evidence. *Id*., 84.

Plaintiff submits that it would be appropriate to consider imposing very similar sanctions as in *Donato* and *Unigard* to level the playing field in this case, in the event that the court decides against striking the answers and entering the default judgment against the responsible parties.

## 3.     CONCLUSION.

Plaintiff has set forth the law and facts herein to support the Court's finding that the incident video was critical evidence that was wilfully destroyed in violation of an affirmative duty established by CDCR, California law, federal case law and common sense.  Therefore, Plaintiff respectfully requests that the Court impose, the following sanctions:

(1)     striking the answer of the State of California, the California Department of corrections and Rehabilitation ("CDCR") and Superintendent Nuñez; or, in the alternative:

(2)     excluding any testimony or reference by any State witness, including experts to any written or oral  hearsay statement that purports to interpret or describe the incident depicted in the destroyed incident video during the remaining pre-trial motions or at trial of this action;

(3)   a curative instruction to the jury that the Defendants had a duty to preserve the incident video, but they failed to do so or it was destroyed, and if the video were viewed, it would depict the events which corroborate the Plaintiff's testimony of how the incident occurred;

(4)   an order precluding the defendants to offer any evidence about the reasons for, or the circumstances surrounding, the destruction or failure to preserve the evidence; and,

(5)   an order allowing plaintiff to submit a bill of costs for all the time expended in seeking to resolve the issue of the destroyed evidence.

Dated: July 14, 2008                          Respectfully submitted,

**LAW OFFICES OF R. SAMUEL PAZ**

By:_____S/S R. Samuel Paz_____
R. Samuel Paz, Co-Counsel for Plaintiffs